

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-18-00255-CV
_____

IN THE INTEREST OF F.J.H., A CHILD

On Appeal from the 223rd District Court
Gray County, Texas
Trial Court No. 37,336-A, Honorable Jack M. Graham, Presiding

November 26, 2018

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PARKER, JJ.

P.H. (mother of the child) appeals from a modification order appointing the intervenors, K.M and S.M., permanent joint managing conservators of F.J.H. in a suit affecting the parent/child relationship brought by the Department of Family and Protective Services (the Department). Through a single issue, P.H. contends that the evidence was insufficient to support the finding that appointing K.M. and S.M. as permanent managing conservators was in the best interest of the child. We affirm.

*Background*

A hearing was held on a Motion to Modify Final Order filed by the Department. Pursuant to that motion, the Department had originally requested that they be discharged

as managing conservator and that P.H. be appointed managing conservator. However, at the time of the hearing "the Department ha[d] reversed its or changed its position, and . . . recommend[ed] that the child remain where he's at, mother maintain her appointment as possessory conservator and that the Court set a visitation schedule of some sort." Furthermore, the foster parents of the child had filed a petition requesting that they be appointed managing conservators of F.J.H.

At trial, the Department presented testimony from Marvelle Collins, the supervisor for the child. That evidence indicated F.J.H. was born on January 11, 2008, and was placed in the Department's custody in October of 2014. He has been in his current placement for approximately two years with his foster parents. In June of 2017, the Department recommended that the child be returned to P.H. It changed its position based on reports from the child's therapist and psychologist. Those reports disclosed that the child desired to remain with his foster parents. Collins testified that she did not believe P.H.'s home to be an unsafe place for the child, but she believed it was in his best interests to remain in his present placement. Moreover, the counselor, the psychologist, and CASA recommended that F.J.H. remain with his foster parents.

Collins was cross examined on why in April of 2017, the Department was recommending reunification and then in June had changed its position. According to the witness, "[w]e looked at all the reports from the therapist, kind of looked at the whole case because we knew we were coming for a— a final hearing, restaffed [sic] it and just based on [the ten year old's] best interest and what he wants to do, the Department requests that he remain where he's at." She agreed that the same reports were available when the Department was recommending reunification but that they "did a whole review of the

2

entire case from removal forward." She, further, explained that the case was difficult "because you're talking about a mom who has . . . worked some services, you're talking about some sibling split, so in this case it's unique, so we . . . went through the whole thing." She, also, stated in the affirmative that P.H. had done everything she was ordered to alleviate the reasons for removal. At the time of the hearing, P.H.'s visitation with her child was once a month. This arrangement was, again, based on the therapist's recommendation. In response to questions about the visits, Collins stated that they are for a weekend. When the child is present at the visitations, he is fine, but when he returns, he struggles.

Three siblings have been returned to P.H.'s care. Two did not finish school, but one of the two was enrolled to obtain his G.E.D. The other child was no longer living with his mother. The third child remains in P.H.'s home and is doing well, according to the witness. Regarding the foster parents, there have never been concerns about their ability to take care of the child. They have bonded with the child, and when the other three children expressed their desire to return to their mother, F.J.H. wished to remain with his foster parents.

Dr. Shaun Keel, a licensed psychologist, had evaluated F.J.H. when he was five years old. She most recently evaluated him in May of 2017. Based on her evaluation, she diagnosed the child with "unspecified anxiety disorder, "[c]hild neglect, confirmed . . . [s]pecific learning disorder, [and] with impairment in reading." She also observed the care given by the foster parents and expressed no concerns. The child told Keel that "he does not want to return home to his mother, and the thought of it has caused him a lot of anxiety." When asked about his brother returning home, he told Keel that it was okay

since his mother had promised that they would keep in touch and he would always be able to see all of his brothers. Keel recommended that F.J.H. remain with the foster parents. Specifically, she testified that "it's in [F.J.H.'s] best interest to stay where he's at. I've had experience with kids who have been separated from their siblings, and again, [F.J.H.] is— believes that he will continue to see his brother because the mom promised that they would have contact." Furthermore, "the thought of living with his mother always brought him anxiety, and . . . this case has gone on so long that we should really listen to what [F.J.H.] has to say and how he feels about things." It was her opinion that if the child returned home "he would have trouble . . . may resent his mother, because he's very bonded to his foster parents."

The child's therapist, Kristi Hosek, stated that she had been counseling F.J.H. since February of 2017. She also provided therapy to P.H. and two of her other sons. Through her testimony, the trial court was told that 1) F.J.H. and his twin brother had been in foster care for five years; 2) in the only family session she had with P.H. and F.J.H., the latter became upset and left the session; 3) she also initially recommended that F.J.H. return to his mother; 4) she changed her opinion because the child's continued desire throughout his therapy to remain with his foster parents, visitation with his mother caused him distress and visits were scaled back; 5) the present visitation schedule seems to be working; 6) F.J.H. does not want overnight stays with his mother; 7) F.J.H. expressed that during his visits with P.H., he is scared and "never thinks he is safe with [her]"; 8) F.J.H. stated that he feels like "there is[n't] a lot of parenting [going on] . . . doesn't feel like there [are] any rules"; 9) F.J.H. does not trust his mother and his concerns have remained constant throughout therapy; 10) F.J.H. "does well with structure and routine, and that's—

4

that's secure for him"; 11) there is a bond between P.H. and F.J.H. but not "a parent-child bond"; 12) F.J.H. expressed a desire for the foster parents to adopt him and be "their real son"; 13) F.J.H. and his foster parents have a parent-child type of bond; and 14) it would be in the child's best interest for the foster parents to be appointed permanent managing conservator and that visitation continue between F.J.H. and his brothers.

The child's foster mother, K.M., testified that F.J.H. and his brothers where placed at Texas Boys Ranch in 2013 where she and her husband worked. The couple left Boys Ranch in 2015 and in June of 2016, after going through the foster care licensing process, all four boys were placed with them. The oldest boy was with them until March of 2017 and then he did not want to be with them or in Pampa any longer, so he was placed at a children's home in Lubbock. The other two boys, including F.J.H.'s twin, was returned to P.H. in June of 2017. According to the witness, 1) F.J.H. is "a highly compliant child by nature, [but] we've noticed in and around visits [with P.H.] he is a little more argumentative . . . he gets anxious, he is a little more argumentative, and he's a little slower to do what things are asked of him"; 2) F.J.H. has nightmares before visits and will "cry or scream in his sleep relatively often"; 3) "[h]e did all right in the 2016-2017 school year . . . [h]e had a great teacher, and he qualifies for special education services, and he had a great special education interventionist who really helped him to gain in confidence"; 4) he has "always struggled, because he was retained in first grade, and it seemed to have a big impact on his self-esteem because [his twin] had gone on to— to the grade above"; 5) they had seen big changes in him since he is "more personable . . . [has] come out of his shell . . . [is] very social and . . . has grown in his emotional well-being"; 6) F.J.H. made the honor roll every six weeks of the school year and he engages with his peers; 7) his teachers

5

love him; 8) has the mindset that he could do anything he set his mind to; 9) he participated in Chess Club, a chess tournament with fourth and fifth graders, and placed 5th out of 23 contestants; and 10) he participates in cross county. In her intervenor's petition, she asked that she and her husband be appointed managing conservators but did not petition for termination of P.H.'s rights. The reason for this was because of his behavior surrounding his visits with his mother, the nervousness, the nightmares and the argumentativeness. Yet, he is always excited to see his brothers.

The trial court granted the motion to modify and appointed the foster parents as permanent managing conservators. It also dismissed the Department from the cause and appointed P.H. possessory conservator.

*Issue – Sufficiency of the Evidence*

In her sole issue, P.H. contends that the trial court erred by finding that the evidence was sufficient to support its final order by clear and convincing evidence. We disagree and overrule the issue.

First, the burden of proof for the modification of a suit affecting the parent/child relationship is by preponderance of the evidence. TEX. FAM. CODE ANN. § 105.005 (West 2014); *Trammell v. Trammell*, 485 S.W.3d 571, 578 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Via that standard, the fact-finder need only determine that the movant's version of the facts is more likely than not true. *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015). As for reviewing that decision, we apply the standard of abused discretion. *Trammell*, 485 S.W.3d at 575. It requires us to consider the evidence in the light most favorable to the trial court's actions and indulge in every legal presumption in favor of the order. *Id.* Furthermore, questions regarding the legal and factual insufficiency of the

6

evidence are not independent issues, under that standard of review; rather, they are considered within the framework of whether the trial court abused its discretion. *Id.* And, a trial court does not abuse its discretion if some probative and substantive evidence appears of record supporting the order. *Id.*

Next, Sections 153.002, 153.005, and 153.131 of the Texas Family Code outline the general standards for determining conservatorship. TEX. FAM. CODE ANN. §§ 153.002, 153.005, 153.131 (West 2014 & Supp. 2018). Section 153.002 provides that the primary consideration in determining issues of conservatorship and possession of and access to the child is always the child's best interest. *Id.* § 153.002. In turn, § 153.005 authorizes the appointment of a managing conservator, and provides that the managing conservator must be "a parent, a competent adult, the Department of Family and Protective Services, or a licensed child-placement agency." *Id.* § 153.005. Additionally, while, there is a presumption that a parent be named as a child's managing conservator, it may be rebutted by evidence that such an appointment would not be in the child's best interest "because the appointment would significantly impair the child's physical health or emotional development" or there is a history of family violence involving the parents. *Id.* § 153.131.

In the case before us, we find that the appellate record contains evidence supporting the trial court's decision and illustrating that it did not abuse its discretion in appointing F.J.H.'s foster parents as his permanent managing conservators. It consisted of, among other things, 1) the child's therapist and counselor opining that F.J.H. should remain in his present placement, 2) his desire to remain with his foster parents, 3) his wish that his the foster parents adopt him, 4) his anxiety, nightmares, and screaming while

asleep in anticipation of his visits with P.H., 5) his lack of structure and parenting while at his mother's home, 6) his lack of trust in and feeling of being unsafe when with his mother, 7) the lack of a parent-child bond between child and mother, 8) the presence of a parent-child bond between F.J.H and his foster parents, 9) the length of time he has been in the care of his foster parents, 10) his improvement at school and involvement in extracurricular activities with other people, and 11) the foster parents' willingness to assure that F.J.H. maintain a relationship with his siblings. Therefore, we find the trial did not abuse its discretion.

Accordingly, we affirm the judgment of the trial court.


Brian Quinn
Chief Justice